533 F.2d 978
 Fed. Sec. L. Rep. P 95,496
Charles E. MARSH, and Detroit Bank and Trust Company as
co-trustees under the Trust of Albert and Minnie
Marsh, and James S. Rothschild,
Plaintiffs-Appellants,
v.
ARMADA CORPORATION et al., Defendants-Appellees.
 No. 75-1885.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 17, 1975.
Decided April 5, 1976.
Rehearing Denied May 7, 1976.
 
 Frank B. Vecchio, Milmet, Vecchio, Kennedy & Carnago, Detroit, Mich., for Marsh.
 Kreindler & Kreindler, Howard Silver, Ronald Litowitz, New York City, Sommers, Schwartz, Silver, Swartz, Tyler & Gordon, Southfield, Mich., for Rothschild.
 David E. Cary, D. Michael Kratchman, Evans & Luptak, Detroit, Mich., for defendants-appellees.
 Before WEICK and LIVELY, Circuit Judges, and MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals.
 WEICK, Circuit Judge.
 
 
 1
 This action is one of an increasing number of lawsuits in which minority shareholders, dissatisfied with the merger terms under which their stock is to be converted into cash or stock of the controlling corporation, seek a federal remedy by alleging violations of Section 10(b) of the Securities Act of 1934 (hereinafter Exchange Act) and Rule 10b-5 promulgated thereunder.[1]
 
 
 2
 A common feature in this type of lawsuit is what is in reality a state law claim for unfairness or breach of fiduciary duty on the part of corporate officers and directors. Also common to this type of lawsuit is an alleged Rule 10b-5 claim which requires the court to explore the frontiers of statutory interpretation in order to ascertain whether federal question jurisdiction exists. Thus in dealing with the issues raised here we are not faced with the question whether the defendants' alleged wrongs call for a remedy, but only whether plaintiffs should have access to the federal courts as well as the state courts to seek the remedy.
 
 
 3
 In 1973 Armada Corporation made a written tender offer for shares of Hoskins Manufacturing Company, in which Armada sought to acquire up to 51% of the outstanding shares of Hoskins, and offered to pay therefor $20 per share. The market price of Hoskins shares at that time was $15 to $15.75 on the American and Detroit Stock Exchanges. Hoskins had paid regular quarterly dividends to its shareholders for forty years prior to the tender offer. The tender offer stated that Armada intended to merge Hoskins into Armada if Armada could gain control of Hoskins, and that Armada contemplated eliminating the dividend paid to Hoskins shareholders.
 
 
 4
 During the course of the tender offer Armada sent a letter to Hoskins shareholders which repeated the offer and then made the following statements:
 
 
 5
 The Hoskins management wants you to believe that the tender offer will fail, yet their attorneys have argued in court for days that the Hoskins shareholders have the choice of tendering their shares now for $20 a share or take Armada stock. This is an admission that Armada will succeed; and they are right, we will win.
 
 
 6
 If Armada acquires control of Hoskins, as stated in the tender offer, we will attempt to merge; and if we merge, we believe that those Hoskins shareholders who retain their shares will be satisfied with the merger, even if we should reduce or eliminate dividends and utilize the liquid resources for expansion and acquisitions, as stated in the tender offer.
 
 
 7
 THE CHOICE IS YOURS TENDER YOUR SHARES NOW FOR $20 A SHARE OR HOLD AND SEE WHAT HAPPENS.
 
 
 8
 The tender offer was successful; Armada purchased 53% of the outstanding Hoskins stock. In August, 1973 Armada elected six of the nine-man Hoskins Board of Directors. In September the board voted to eliminate Hoskins' quarterly dividend, and announced that dividends would not be paid in the future. In December the companies announced a proposed merger agreement in which Hoskins shareholders would receive 1.27 Armada shares for each share of Hoskins.
 
 
 9
 The market value of Hoskins and Armada shares had declined since the tender offer. In December Armada shares had a market value of $7.25 and Hoskins shares about $9.25. Thus Hoskins shareholders were to receive about $9.25 worth of Armada stock for each Hoskins share. In June, 1974 the merger was approved; under the laws of Michigan only a majority of shares need approve a merger, and no appraisal rights existed in this case.
 
 
 10
 This class action was filed in the Eastern District of Michigan by several Hoskins shareholders in May, 1974 on behalf of all persons holding Hoskins shares continuously from the commencement of the tender offer through the announcement of the proposed merger terms.
 
 
 11
 The complaint contained three counts, seeking only damages: first, allegations that Armada had violated Rule 10b-5; second, allegations that the directors of Hoskins had breached their fiduciary duty to the shareholders; and third, allegations that the merger terms were unfair and oppressive. The last two counts were state law claims which the District Court declined to consider.
 
 
 12
 The District Court dismissed the action under Fed.R.Civ.P. 12(b)(1) for failure to state a federal question, holding that federal interest in a tender offer or merger transaction under § 10(b) of the Exchange Act ceases when it becomes apparent that the parties were fully informed of all material facts prior to the transaction, applying the rationale of Popkin v. Bishop, 464 F.2d 714 (2d Cir. 1972).
 
 
 13
 In an earlier phase of the case Hoskins sought to enjoin the merger but the District Court did not grant such relief. The validity of the merger is not in issue here.
 
 
 14
 In this appeal Hoskins shareholders argue that the expansive definition of fraudulent activities used by the courts in Rule 10b-5 cases includes conduct of the type encountered here. Specifically, they contend that Armada employed a fraudulent scheme to take control of Hoskins and then to drive down the value of Hoskins stock by omitting dividends so that Hoskins could be merged into Armada more cheaply.
 
 
 15
 The three acts within this scheme which the shareholders believe to be fraudulent are: 1) the statement in the letter during the tender offer that Hoskins shareholders will be satisfied with the merger terms; 2) the elimination of the dividend to lower the market value of Hoskins shares so that the merger could be accomplished with fewer Armada shares; and 3) the failure to state in the merger proxy statement that Hoskins expected to earn more in 1974 than it earned in 1973.
 
 
 16
 It will be necessary to examine each of these factors to determine whether this conduct is proscribed by Rule 10b-5. First, however, the question of standing must be considered.
 
 
 17
 * STANDING
 
 
 18
 Armada claims that the complaint must be dismissed because the shareholders did not allege that they purchased or sold shares. Thus they have no standing to sue under Rule 10b-5 which prohibits fraud only in connection with the purchase or sale of a security. The Birnbaum rule,[2] recently approved in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), holds that a plaintiff in a Rule 10b-5 case has standing to sue only if a fraudulent activity caused him to buy or to sell stock. A person who claims that a fraudulent activity caused him to not buy stock which he otherwise would have bought, or to not sell stock which he otherwise would have sold, has no standing to sue under Rule 10b-5.
 
 
 19
 The basis of the rule is a policy determination that to permit suits by persons who claim inaction in reliance on fraudulent claims would open the door to vexatious and meritless lawsuits by persons who never owned stock but who comb the financial pages for possible inaccuracies which could support colorable claims with significant settlement value. Furthermore, the proof in such a lawsuit would consist of the plaintiff's unsupported testimony that he intended to purchase or sell a certain stock but that he did not do so after reading a certain report. In requiring a purchase or sale to occur, the Birnbaum rule seeks to support a claim of reliance by the fact that the plaintiff purchased or sold stock soon after an allegedly fraudulent act occurred.
 
 
 20
 The shareholders claim that the statement contained in the letter, ". . . we believe that those Hoskins shareholders who retain their shares will be satisfied with the merger . . ." caused them to retain their shares, to their loss, rather than sell or tender the shares to Armada, and that the statement was false and fraudulent. The shareholders have no standing to sue on this basis. This is the precise type of claim which the Birnbaum rule was intended to prevent, i. e., the "reliance by inaction" claim.
 
 
 21
 The shareholders further claim that Armada fraudulently caused the value of the stock to drop; the question of standing to sue on this claim is more difficult. The exchange of shares in the merger certainly qualifies as a purchase or sale under the Birnbaum rule; SEC v. National Sec., Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668, 680 (1969). Armada argues that the shareholders failed to allege that they sold or exchanged their stock. However, they did allege that the merger was consummated, and under the liberal rules of notice pleading this allegation is sufficient to meet the Birnbaum requirement of a sale, as were similar allegations in Vine v. Beneficial Fin. Co., 374 F.2d 627 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).
 
 
 22
 In Vine the Court discussed the element of reliance and held that reliance need not be shown if the deception complained of was directed at a third person. Armada argues that, unlike Vine, the fraud alleged here created no reliance at all; therefore the exchange of stock cannot be considered a sale for purposes of the Birnbaum rule, and the shareholders have no standing. Vine did not state that reliance must be alleged to gain standing. Only after disposing of the standing issue did the Court in Vine discuss reliance. The presence or absence of a sufficient allegation of reliance is a question addressing the sufficiency of the complaint, not the standing of the shareholders. Standing is established by allegations that plaintiffs bought or sold shares of the stock in question within a reasonable period of time after the allegedly fraudulent conduct occurred to support an inference of reliance.[3]
 
 
 23
 Since the shareholders here allege that the terms of the merger exchange were the result of a fraudulent scheme, and since a merger exchange constitutes a sale for purposes of standing, we find that the shareholders have standing to assert a claim that they were defrauded in the merger exchange. We therefore turn to the allegations of the complaint to determine whether the shareholders have sufficiently stated a claim for relief.
 
 II
 SUFFICIENCY OF THE COMPLAINT
 
 24
 We have already noted that the shareholders have no standing to claim that the letter contained a misrepresentation upon which they relied, since they did not purchase or sell in reliance on the letter. In Vine the Court held that a misrepresentation which caused a tender offer to be successful is actionable by those shareholders who did not tender but were forced to exchange shares in a subsequent merger.
 
 
 25
 Here the shareholders do not claim that the misrepresentation in the letter caused the tender offer to be successful, as they are not attacking the merger; rather, the only possible effect of the alleged misrepresentation would be to discourage shareholders from tendering their stock for five dollars more than the market value. Thus, they cannot claim that reliance by others upon the alleged misrepresentation caused their losses. Therefore they cannot show that anyone relied upon the alleged misrepresentation to their detriment, and we need not reach the question whether the letter contained a misrepresentation.
 
 
 26
 Turning to the allegation that Armada fraudulently manipulated the market price of Hoskins shares, we face the most significant question in this appeal: Is an elimination of dividends for the purpose of lowering the market value of a stock prior to a merger actionable under Rule 10b-5 if the intent to eliminate dividends is announced publicly during the pendency of a tender offer? Stated another way, the question is whether manipulation of the market price of the stock by eliminating dividends, with prior full disclosure, violates § 10(b) of the Exchange Act.
 
 
 27
 Section 10(b) does not flatly prohibit the use of a manipulative device in the purchase or sale of a security; rather, it prohibits "any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the (SEC) may prescribe." Only those manipulative devices prohibited in SEC Regulations are unlawful under the Exchange Act.
 
 
 28
 The Regulations prohibit a number of specific manipulative devices, but none of them covers the situation here. Rule 10b-5, 17 C.F.R. § 240.10b-5, is a catchall provision to cover schemes not specifically prohibited in other provisions. Nevertheless, if the shareholders' claim does not fall within the language of Rule 10b-5 it is not actionable under § 10(b) of the Exchange Act. Rule 10b-5 reads as follows:
 
 
 29
 It shall be unlawful for any person, directly or indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange,
 
 
 30
 (1) to employ any device, scheme or artifice to defraud,
 
 
 31
 (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or(3) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 
 
 32
 The three prohibited activities listed in Rule 10b-5 share a common element, the element of fraud. The fraud prohibited in Rule 10b-5 is said to not be subject to the limitations of common law fraud.[4] The Supreme Court has stated that the elements of common law fraud have changed in Rule 10b-5 cases. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 192-95, 84 S.Ct. 275, 283, 11 L.Ed.2d 237, 246 (1963) (intent to injure need not be proven when injunctive relief is sought). Subsection 2 of Rule 10b-5 is clearly inapplicable here because no actionable misrepresentation is presented in this case. The question thus becomes whether the alleged plan and conduct of Armada was fraudulent within the meaning of subsections 1 and 3 of the Rule.
 
 
 33
 No deception in regard to the manipulation of the market price of the stock is alleged here. Armada announced that it intended to eliminate the dividend and to merge the companies if its tender offer succeeded. This is precisely what occurred. Shareholders generally know that a company with a long history of dividend payments may face a short term drop in the market value of its stock when it announces the elimination of dividends, the drop being caused largely by the immediate desire to sell by many income-seeking investors holding that stock for its dividends. Confronted with this announcement during the tender offer, the shareholders knew they could tender for twenty dollars a share or risk the market effect of the elimination of dividends.
 
 
 34
 On the other hand, many shareholders, having faith in the merged company, might desire to exchange their Hoskins shares for Armada shares, hoping ultimately to enjoy a large increase in the value of their shares which they could sell and be taxed at capital gain rates.
 
 
 35
 We must therefore construe the shareholders' claim to be that when a party announces during a tender offer its intention to eliminate dividends of the company when acquired, and thereafter does so for the purpose of lowering the cost of a subsequent merger to itself, it has defrauded the shareholders.
 
 
 36
 The legal support for the shareholders' claim is found in Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 546 (2d Cir. 1967), which construed two earlier cases to hold that "manipulation of market price and purposeful reduction of dividends in order to buy out minority stockholders cheaply was actionable under Rule 10b-5." The Court then found a Rule 10b-5 claim based upon purposeful reduction of dividends, stating: "Deceitful manipulation of the market price of publicly-owned stock is precisely one of the types of injury to investors at which the Act and the Rule were aimed." 384 F.2d at 547. The deception in Mutual Shares arose because there was no disclosure of the intent or purpose of lowering dividends.
 
 
 37
 The two cases relied upon in Mutual Shares also require deception as a part of a dividend reduction scheme actionable under Rule 10b-5. In Cochran v. Channing Corp., 211 F.Supp. 239 (S.D.N.Y.1962), Channing embarked upon an unannounced program to acquire a company, in the course of which Channing caused the board of directors of the company to reduce its dividend. The plaintiff sold his shares when the price of the stock was depressed because of the dividend reduction and before the program was disclosed. When the program was disclosed the value of the stock rose. In finding fraud in the dividend reduction scheme the Court said:Fraud may be accomplished by false statements, a failure to correct a misleading impression left by statements already made or, as in the instant case, by not stating anything at all when there is a duty to come forward and speak. (Id. at 243).
 
 
 38
 In O'Neill v. Maytag, 339 F.2d 764, 768 (2d Cir. 1964), the Court cited Cochran to illustrate the proposition that deception can take the form of non-verbal acts, such as reducing dividends to drive down the price of a stock. However, O'Neill endorsed the need for allegations of deception:
 
 
 39
 The question posed by this case is whether it is sufficient for an action under Rule 10b-5 to allege a breach of one of these general fiduciary duties where the breach does not involve deception. We think that it is not: At least where the duty allegedly breached is only the general duty existing among corporate officers, directors and shareholders, no cause of action is stated under Rule 10b-5 unless there is an allegation of facts amounting to deception.
 
 
 40
 . . . (T)here must be allegation of facts amounting to deception in one form or another; conclusory allegations of deception or fraud will not suffice. (339 F.2d at 767-68).
 
 
 41
 Mutual Shares and Cochran held that deceptive schemes involving unannounced plans to reduce dividends were actionable under Rule 10b-5. The factual differences between those cases and the case at bar are crucial. Armada announced its intent to eliminate the dividends to Hoskins shareholders at a time when the shareholders had an opportunity to escape the consequences of the proposed action by selling their stock for a four dollar premium over market value. In Mutual Shares and Cochran nondisclosure of the intent to systematically lower dividends caused the manipulation to be deceptive and prevented the shareholders from being able to protect their investment. Here we cannot find any action that deceived or defrauded the shareholders.
 
 
 42
 The Hoskins shareholders are in reality asserting that a dividend reduction accomplished for an improper purpose raises a Rule 10b-5 claim because such action is fraud per se. Certainly the directors of Hoskins have a duty to act in the best interest of the shareholders, so if the elimination of dividends was not in their best interest, the directors have breached that duty. However, we decline to equate a breach of fiduciary duty with fraud. Although fraud by directors usually is also a breach of fiduciary duty, a breach of fiduciary duty in formulating the terms of a merger does not itself raise a Rule 10b-5 claim; to hold otherwise is to provide a federal forum for all shareholders dissatisfied with the terms of a proposed merger, which is not the intent of § 10(b) of the Exchange Act.
 
 
 43
 In Popkin v. Bishop, 464 F.2d 714 (2d Cir. 1972), relied upon by the District Court, the Second Circuit considered allegations that the exchange ratio offered in a merger was grossly inadequate, unfair, and constituted improper self-dealing which amounted to a fraud upon the shareholders because they would receive, as in this case, inadequate consideration for their stock. After noting that a full and fair disclosure of the merger terms had occurred, the Court said:
 
 
 44
 Thus it seems clear that our emphasis on improper self-dealing did not eliminate non-disclosure as a key issue in Rule 10b-5 cases. Section 10(b) of the Exchange Act and Rule 10b-5 are designed principally to impose a duty to disclose and inform rather than to become enmeshed in passing judgments on information elicited (citations omitted). This design has special relevance to merger transactions that, under state law, must be subjected to shareholder approval. In the context of such transactions, if federal law ensures that shareholder approval is fairly sought and freely given, the principal federal interest is at an end. Underlying questions of . . . fairness become tangential at best to federal regulation. . . . And when what is sought is injunctive relief, a federal court of equity should regard this consideration as controlling. Thus, in the present case, we believe that once appellant admitted that defendants fully and fairly disclosed all material facts surrounding the merger to all interested parties, including the minority shareholders, appellant's claim under Rule 10b-5 for injunctive relief must fall. (464 F.2d at 719-20).
 
 
 45
 In the recent case of Green v. Santa Fe Industries, --- F.2d ----, No. 75-7256 (2d Cir. 1976), the Court held that the use of a short form merger transaction to eliminate minority shareholders, without a legitimate corporate purpose, constitutes fraud per se. The Court noted that the short form merger statute being followed by Santa Fe required no notice to the minority, and that therefore it was important for the federal courts to scrutinize the transaction under Rule 10b-5 regardless of disclosure. In Marshel v. AFW Fabric Corp., --- F.2d ----, No. 75-7404 (2d Cir. 1976), the Court reached the same conclusion on another "going private" merger transaction even though no allegation was made that notice was not given; in fact, in Marshel the Court assumed that prior disclosure had occurred, but stated that prior disclosure was irrelevant because the minority were helpless to stop the merger outside of the courts.[5]
 
 
 46
 The shareholders believe that Green and Marshel equate breach of fiduciary duty with fraud, and that unfair merger terms are therefore actionable under Rule 10b-5. In view of the fact that both decisions declined to overrule Popkin, we must construe the holding of these cases more narrowly. In Green the Court said:
 
 
 47
 We hold that a complaint alleges a claim under Rule 10b-5 when it charges, in connection with a Delaware shortform merger, that the majority has committed a breach of its fiduciary duty to deal fairly with minority shareholders by effecting the merger without any justifiable business purpose. The minority shareholders are given no prior notice of the merger, thus having no opportunity to apply for injunctive relief, and the proposed price to be paid is substantially lower than the appraised value reflected in the Information Statement. We do not hold that the charge of excessively low valuation by itself satisfies the requirements of Rule 10b-5 because that is not the case before us.
 
 Similarly, in Marshel the Court said:
 
 48
 We hold that when controlling stockholders and directors of a publicly-held corporation cause it to expend corporate funds to force elimination of minority stockholders' equity participation for reasons not benefiting the corporation but rather serving only the interests of the controlling stockholders such conduct will be enjoined pursuant to Section 10(b) and Rule 10b-5 . . . .
 
 
 49
 These two decisions cannot be read apart from the milieu of "going private" merger transactions. When a company goes public the purchasing shareholders become owners of the company for better or for worse; if the stock declines in value they expect that they will be able to choose to await better times and a higher price in the future. However, by using a merger device which is not really a merger, some corporations have caused these shareholders to lose their ability to await future benefits of ownership, while increasing the majority interest of the controlling shareholder at the expense of the corporation. The Second Circuit believed that Popkin was inapplicable to "going private" transactions, but did not hold or intimate that Popkin was inapplicable to a situation analogous to it.
 
 
 50
 We find that Popkin contains the more appropriate test to apply in this case; in comparing the facts of Popkin, Green and Marshel to the situation here, the similarity of Popkin cannot be ignored. In Green and Marshel the shareholders were attacking the merger itself as a fraud. In Popkin as here the shareholders do not attack the merger other than upon the fairness of its terms. In Green and Marshel the merger was a sham transaction designed to expropriate the ownership interests of the minority shareholders. In Popkin as here the merger was a true combining of two businesses, with the shareholders of both corporations obtaining interests in the surviving corporation. In Green the Court stated that a transaction without notice to the shareholders should be subject to scrutiny under Rule 10b-5, and in Marshel the Court stated that "fraudulent practices carried out with prior disclosure to the helpless victim" should call for a Rule 10b-5 remedy. In our case, the shareholders were not "helpless victims" because they were told of the proposed dividend elimination at a time when they had an opportunity to sell their shares at a premium; thus the impetus to distinguish Popkin, present in Green and Marshel, is absent here. We therefore conclude that when the shareholders allege that the terms of a merger are not only unfair but fraudulent but do not challenge the purpose of the merger they must allege deception as required by Popkin.[6] The necessity to allege more than internal selfdealing and failure to act in the best interest of the shareholders was recognized by the Supreme Court in Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128, 134 (1971):
 
 
 51
 Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement. But we read § 10(b) to mean that Congress meant to bar deceptive devices and contrivances . . . .
 
 
 52
 The shareholders' reliance upon Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374 (2d Cir. 1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), as indistinguishable from this case, is misplaced. Schlick quoted the passage from Bankers Life, supra, and then found that undisclosed manipulations of the market price of the stocks of companies preparing to merge constituted fraud under Rule 10b-5. Schlick thus merely proves the validity of the observation in Popkin that:
 
 
 53
 (C)ases based upon Rule 10b-5 in which a court can properly find full and fair disclosure may not be frequent since self-dealing schemes and transactions are by nature secretive. . . . But when there has been such disclosure of a merger's terms, its (sic) seems unwise to invoke federal injunctive power, particularly since doing so might well encourage resort to the federal courts by any shareholder dissatisfied with a corporate merger. (464 F.2d at 720).
 
 
 54
 Returning again to the letter, we recognize that the shareholders have attempted to allege a deceptive scheme based upon misstatements in the letter. However, even if the statement in the letter did induce the shareholders to retain their stock, it cannot be considered a part of the scheme alleged.
 
 
 55
 Armada circulated the letter for the purpose of inducing tenders of Hoskins stock, not for the purpose of inducing shareholders to retain their shares. To argue that Armada intended to deceive the shareholders into retaining their shares is to ignore the fact that Armada's alleged scheme to lower the value of the stock could be served only by inducing sales of the stock by shareholders. The statement in the letter that the shareholders would be satisfied with merger terms can be interpreted in no way as part of a scheme to lower the value of the stock.
 
 
 56
 The shareholders also claim that the merger proxy statement was deceptive because it failed to state that Hoskins expected to achieve earnings in 1974 higher than it had earned in 1973. The failure to make a projection of future earnings of an acquired company in a merger proxy statement is not actionable under Rule 10b-5. In Arber v. Essex Wire Corp.,490 F.2d 414, 421 (6 Cir. 1974), we stated:
 
 
 57
 (T)he law mandates disclosure only of existing material facts. It does not require an insider to volunteer any economic forecast.
 
 
 58
 The SEC has addressed the problem of requiring disclosure of earnings forecasts in Exchange Act Release No. 9984, 17 C.F.R. 241.9984 (Feb. 2, 1973), and has stated:
 
 
 59
 The Commission has never required a company to publicly disclose its projections and does not intend to do so now. It has been the Commission's long standing policy generally not to permit projections to be included in prospectuses and reports filed with the Commission.
 
 
 60
 The SEC concluded that corporations should not be required to publicly state earnings projections, but that if they wished to do so the content of the projections would be regulated. This proposal was not extended to cover annual reports and proxy statements until April 28, 1975 in Exchange Act Release No. 11374. In that Release there was proposed an amendment to Exchange Act Reg. § 240.14a-9 Note, which read:
 
 
 61
 The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this rule:
 
 
 62
 a. Predictions as to specific future market values, earnings, or dividends.
 
 
 63
 The proposed amendment deletes the word "earnings" from the text of the Note; thus one of the major roadblocks to the use of earnings projections in proxy statements was removed; however, this proposal was issued subsequent to the issuance of the proxy statement at issue here. We do not find any authority for the proposition that a failure to project higher earnings in a merger proxy statement is actionable under Rule 10b-5.
 
 
 64
 Because the shareholders have stated claims under which a court could find only violations of fiduciary duties and of state statutes prohibiting transactions unfair and oppressive to shareholders, the District Court lacked federal question jurisdiction, and properly dismissed the complaint.
 
 
 65
 Affirmed.
 
 
 
 *
 The Honorable Howard T. Markey, sitting by designation
 
 
 [1]
 This trend is noted and reasons for it are discussed, in R. Jennings & H. Marsh, Securities Regulation 1223-30 (3d. ed. 1972)
 
 
 [2]
 Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir.), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952)
 
 
 [3]
 Although the presence of reliance goes to the sufficiency of the complaint, standing is not accorded to a plaintiff if his purchase or sale occurs before the alleged fraudulent conduct, or after the alleged fraudulent conduct was exposed, as in In re Penn Central Sec. Litigation, 62 F.R.D. 181 (E.D.Pa.1974), and In re R. Hoe & Co., (1973-1974 Transfer Binder) CCH Fed.Sec.L.Rep. P 94,552 (S.D.N.Y.1974), because in such situations reliance clearly could not exist. But see Voege v. American Sumatra Tobacco Corp., 241 F.Supp. 369 (D.Del.1965) (purchase occurred fifteen years before alleged fraudulent conduct)
 
 
 [4]
 James v. Gerber Prods. Co., 483 F.2d 944, 946 (6th Cir. 1973). See also Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 378, n. 8 (2d Cir. 1974), where the Court suggests that in pleading under Rule 10b-5 particularity might not be required by Fed.R.Civ.P. 9(b), because 9(b) refers to common law fraud only. However, the further suggestion that subsection 2 of Rule 10b-5 refers to common law fraud seems untenable because the element of reliance need not be proven if a material omission is claimed under Rule 10b-5(2)
 
 
 [5]
 Judge Smith in a concurring opinion stated that he found it difficult to reconcile the holding of Popkin with the result of Marshel
 
 
 [6]
 We note that there is language in James v. Gerber Products Co., 483 F.2d 944, 948 (6th Cir. 1973), which seems to state that unfair dealings are actionable under Rule 10b-5:
 A principal purpose of § 10(b) and Rule 10b-5 is to protect purchasers and sellers of securities from those who deal unfairly with them.
 However, since James involved nondisclosure of a material fact in a proxy statement, that case cannot be read to hold that allegations of unfairness are sufficient to state a Rule 10b-5 claim.