**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0596n.06

No. 15-5064

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| ARUN BONDALI, et al., | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | **FILED** |
| | ) | Aug 20, 2015 |
| v. | ) | DEBORAH S. HUNT, Clerk |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| YUM! BRANDS, INC., et al. | ) | WESTERN DISTRICT OF KENTUCKY |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

**BEFORE: CLAY and McKEAGUE, Circuit Judges; BERTELSMAN, District Judge.***

**McKEAGUE, Circuit Judge.** In this securities class action, investors sued Yum! Brands, Inc. ("Yum"), a publicly traded corporation which owns restaurant chains Taco Bell and Kentucky Fried Chicken ("KFC"). The investors also sued three of Yum's senior officers: CEO David C. Novak, Richard T. Carucci, and Jing-Shyh Su. In their amended complaint, the investors allege that Yum and its senior officers knew batches of chicken being supplied to Yum's KFC China subsidiary[1] had tested positive for drug and antibiotic residues and that Yum's food standards and safety protocols were ineffective and also inadequate. The thrust of the amended complaint is that it was false or misleading for Yum not to disclose the adverse results and system failures to the public, the result of which was a 17 percent drop in stock price

---

* The Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1] Yum! China is a division of Yum! Brands, Inc. and is based in Shanghai, China. (*See* R. 72, Page ID # 638.) KFC China is a brand of Yum! China. (*See id*. at Page ID # 679.)

after the media began exposing the issues. The district court dismissed the amended complaint for failure to state a claim on which relief could be granted. For the reasons below, we affirm.

## I.

Between 2010 and 2011, Yum received a series of test results from the Shanghai Institute for Food and Drug Control ("SIFDC"). The SIFDC is an independent laboratory Yum retained to conduct bimonthly spot testing on the chickens it accepted for distribution to its Chinese KFCs. The results showed that eight of nineteen batches of chicken from one supplier, the Shandong Liuhe Group ("Liuhe"), had tested positive for drug and antibiotic residues prohibited under Chinese law. (R. 72, Page ID # 650.) In a December 2012 statement, Yum reported that, after receiving the test results in 2011, it disqualified the Linyi Factory ("Linyi"), a Liuhe subsidiary, identifying Linyi as "the factory saddled with the major problems." In that same statement, Yum also explained that, in August 2012, it also disqualified Liuhe. (R. 72-11, Page ID # 827.)

Yum, however, did not immediately disclose the SIFDC results or disqualifications of Liuhe and Linyi to regulators or the public. Moreover, Yum did not immediately disclose that, in 2010, it learned of another supplier's poultry—the Yingtai Group—also testing positive for drug and antibiotic residues. (R. 72, Page ID # 672.)[2]

Indeed, Yum did not publicly acknowledge any issues with drug or antibiotic residues until the media began reporting on the issues in late 2012. The first media report mentioned in the amended complaint is a November 23, 2012 *Bloomberg News* article. It suggested that another supplier, the Shanxi Suhai Group, was using hormones to increase the size of its

---

[2] The amended complaint also identifies two other suppliers, Wintop Food and Shanxi Suhai, as having sold contaminated poultry to Yum. (R. 72, ¶ 11, Page ID # 635.) The plaintiffs' Section 10(b) claim, however, rests only on Yum's failure to disclose the issues with Liuhe and Yingtai. (*See id*. at Page ID # 701–703.)

chickens. (*See id*. at Page ID # 711.) The most comprehensive media report aired on December 18, 2012 on Chinese Central Television ("CCTV"). That report suggested that Yum's issues with food safety went beyond a single supplier. Rather, several farmers in Shandong Province, including farmers selling to Liuhe and Yingtai, were feeding their poultry antibiotics and other drugs to increase the chickens' size and reduce the chickens' mortality rates. (*See* R. 72-18, Page ID # 895–897.) CCTV also reported that farmers were not maintaining the legally required "feeding journals" and that suppliers like Liuhe were fabricating their inspection and quarantine certificates to show there were no drug residues in the chicken. (*See id*. at Page ID # 899–900.)

The day after the CCTV report aired, Chinese regulators "raided, ransacked, then shuttered several farms and plants that had supplied chicken to KFC." Yum's stock price also declined 2.7 percent. (*See id*. at Page ID # 717.) By the end of the Class Period, Yum stock had "f[a]ll[en] nearly 17% from $74.47 per share on November 29, 2012, to $68.08 per share on February 5, 2013." (*Id*. at Page ID # 720.) February 5, 2013—the day after the close of the Class Period—was, according to the plaintiffs, the day on which "the truth was fully revealed" by Yum admitting that: "Due to continued negative same-store sales and [Yum's] assumption that it will take time to recover consumer confidence, we no longer expect to achieve [earnings per share] growth in 2013." (*Id*. at Page ID # 676).

The plaintiffs allege the market's negative response to the media reports was unsurprising, given first the "hypersensitive" nature of Chinese consumers to food contamination issues, (*see* R. 72, Page ID # 634), and second the consumer backlash that has followed previous food safety issues at Yum. For example, in 2005, news that Chinese KFCs were using Sudan Red Dye, "a known and prohibited carcinogen," caused "Yum's sales to drop immediately and remain depressed for months." (*See id.* at Page ID # 634.) Likewise, in 2007, Yum's

"reputation, and bottom line … took a severe hit when E.coli was found in food sold by several Taco Bell restaurants in the U.S." (*See id.*)

## II.

The cases forming this class action were consolidated on May 1, 2013. An amended complaint on behalf of the consolidated class was filed on August 5, 2013, contaning three counts: Count I alleged that Yum violated Section 10(b) of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; Count II alleged Section 10(b) and Rule 10b-5 liability against the individual defendants; and Count III alleged controlling-person liability against the individual defendants under Section 20(a) of the 1934 Securities Exchange Act, 15 U.S.C. § 78t(a). On October 14, 2013, the defendants filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and on December 23, 2014, the district court granted the motion, dismissing all three counts with prejudice.

The amended complaint avers that during the Class Period, the defendants made ten materially false or misleading statements. These statements can be divided into four categories.[3]

***Cautionary Statements or Risk Disclosures.*** The defendants made statements on the investment risk that food safety issues posed. One appears in each of Yum's Earnings Announcements and 10-Qs during the Class Period:

- Our forward-looking statements are subject to *risks and uncertainties*, which may cause actual results to differ materially from those projected. *Factors that can cause our actual results to differ materially include, but are not limited to: food borne-illness or food safety issues[.]* (R. 72, Page ID # 701.)

The other appears in the "Risk Factors" section of Yum's 2011 Form 10-K:

---

[3] Because of their length, we have copied the statements only in relevant part. To do so, we have relied on the amended complaint's own italicization of those portions of the statements which the plaintiffs believed most supported their claims. The statements as they originally appeared in the amended complaint can be found at R. 72 in the district court record.

- [F]ood safety issues have occurred in the past, and could occur in the future. Any report or publicity linking us or one of our Concept restaurants, including restaurants operated by our franchisees, to instances of food-borne illness or other food safety issues, including food tampering or contamination, could adversely affect our Concepts' brands and reputations as well as our revenues and profits.…In addition, instances of food-borne illness, food tampering or food contamination solely involving our suppliers or distributors or solely at restaurants of competitors could adversely affect our sales as a result of negative publicity about the foodservice industry generally. Such instances of food-borne illness, food tampering and food contamination may not be within our control. (*Id*. at Page ID # 702–703.)

The plaintiffs allege these statements were misleading because they portrayed food safety issues as a potential risk instead of a risk that had already materialized, given the issues with Liuhe and Yingtai.

***Statements Touting Standards and Protocols.*** Yum also made statements generally touting its food standards and safety protocols. Two appear in Yum's 2011 Form 10-K:

- These suppliers are required to meet and maintain compliance with the Company's standards and specifications. (*Id*. at Page ID # 703.)

- All restaurants, regardless of their ownership structure or location, must adhere to strict food quality and safety standards. The guidelines are translated to local market requirements and regulations were appropriate and without compromising the standards. (*Id*. at Page ID # 704.)

The third appears in Yum's Code of Conduct, cited by Yum in its 2012 Proxy Statement:

- Food safety is a primary responsibility of Yum!, and nothing, including cost, is allowed to interfere with this responsibility.

  To ensure that our customers receive safe, wholesome food, and "food you crave," Yum!:

  - Maintains strict specifications for raw products including specifications which meet or exceed government requirements.

  …

  - Adheres to a strict food safety testing program.

> o Continually monitors and improves its procedures and practices to ensure food safety.

The responsibility for food safety is shared by everyone in our system:

…

> o Any product suspected to be unsafe must immediately be pulled from distribution until safety can be assured….

(*Id.* at Page ID # 706–707.)

Lastly, during a March 2012 investor conference, Carucci told the audience:

- But realistically, we know there's probably more risk [in China] than there is in places like Western Europe and the US in terms of just the way the food chain works. But we've spent a lot of time and energy getting that right and having the right suppliers. (*Id.* at Page ID # 654.)

The plaintiffs allege these statements were false or misleading because Yum's standards and protocols were nowhere near strict. Rather, Yum's standards and protocols were "woefully inadequate to cope with the known problem of local farmers administering dangerous chemicals to chickens supplied to Yum." (R. 72, Page ID # 705.) The plaintiffs raise several inadequacies with Yum's standards and protocols: that spot testing was performed only bimonthly and that suppliers violating the standards were not immediately disqualified, just to name a few. (*See* R. 72, Page ID # 660–61, 666.)

***Responses to Negative Publicity.*** The next statements were responses made to the negative publicity that began in November 2012. They concern the actions Yum was undertaking or promising to undertake to protect consumers.

- KFC always attaches importance to food safety, requesting all chicken suppliers to adopt complete food safety management measures. It also makes spot checks on their products. Shanxi Suhai Group is a relatively small regional supplier within KFC's chicken supply system, supplying only about 1% of the chicken for KFC, and it has maintained a normal food safety record in the past. KFC will carry out investigations according to the media reports,

enhance inspections and mete out punishments according to the results of the investigations. (*Id*. at Page ID # 712.)

- All chickens will undergo inspection by the government, suppliers, and KFC before entering KFC. KFC will continue to supervise all the suppliers, strength the management of the suppliers continuously to ease people's concern about food safety risks, and keep the superior and eliminate inferior suppliers to minimize the risks. (*Id*. at Page ID # 714.)

- KFC requires all the suppliers to conduct drug residue inspections of their chicken products supplied to KFC….KFC makes spot checks on drug residues in all the chickens purchased. (*Id*. at Page ID # 716.)

***Statement on Softer Sales***. Lastly, the plaintiffs allege it was false or misleading for Novak in a November 29, 2012 Press Release to attribute lowered same-store sales projections to "softer sales in China" because, in fact, the lowered projections were due to the negative publicity. (*See id*. at Page ID # 712.)

### III.

We review de novo a district court's Rule 12(b)(6) dismissal of a complaint. "[C]onstru[ing] the complaint in the light most favorable to the plaintiff" and "accept[ing] all well-pleaded factual allegations as true," *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477 (6th Cir. 2010), we must determine whether the complaint alleges "enough facts to state a claim that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible if the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is not plausible if the facts alleged are "merely consistent with a defendant's liability." *Id*. (quotation marks and citation omitted).

Because Section 10(b) and 20(a) claims sound in fraud, this court must also impose the pleading requirements of Federal Rule of Civil Procedure 9(b) and determine whether the complaint alleges fraud with particularity. Fraud is alleged with particularity by identifying the

statements or omissions alleged to be false or misleading and detailing the "who, what, when, where, and how" of the alleged fraud. *See Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. (1987)). Lastly, the complaint must satisfy the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"). Under the PSLRA, a complaint bringing Section 10(b) or Rule 10b-5 claims must, with respect to each actionable statement, allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter.]" 15 U.S.C. § 78u-4(b)(2)(A). "Scienter may take the form of knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quotation omitted).

**IV.**

To state a claim under Section 10(b) and Rule 10(b)(5), the plaintiffs must plausibly allege the following elements:

> (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

> *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

The district court dismissed the amended complaint for failure to allege the first and second of these elements. We begin with its assessment as to the first element and agree that a "material misrepresentation or omission" has not been alleged because the amended complaint fails to assert facts showing Yum's statements were "objectively false or misleading in light of the information now known," *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 478 (6th Cir. 2014).

**A.**

Beginning with Yum's general statements touting its standards and protocols, the plaintiffs have alleged no facts to suggest that Yum *did not* require its suppliers to adhere to corporate food standards and safety protocols. In fact, the amended complaint makes several assertions of fact to suggest that Yum *did* impose such requirements. As detailed in the amended complaint, Yum performed bimonthly spot testing of its chickens, conducted evaluations of its suppliers, and disqualified suppliers that did not meet its requirements like Liuhe.[4] (*See* R. 72, Page ID # 658 (discussing example of supplier disqualification); 660–61 (discussing supplier evaluations); 666 (discussing spot testing); 682–83 (discussing audit system).) That a few suppliers did not adhere to the standards does not mean Yum did not have the standards in place, and it is not reasonable to interpret Yum's statements as a guarantee that its suppliers would, in all instances, abide by the corporate standards and protocols.

It is also difficult to see how Yum misled investors by describing its food quality and safety standards as "strict." The fact of the matter is Yum had multiple protocols in place to promote food quality and safety, including spot checks, supplier evaluations, and an auditing system. Describing those protocols as "strict" was reasonably grounded in objective fact and, thus, is not "disproven" just because Yum could have strengthened its standards and protocols. By pointing out the structural weaknesses of Yum's standards and protocols, all the plaintiffs

---

[4] Counsel for the plaintiffs suggested at oral argument that the panel could not accept as true that Yum had disqualified Liuhe. However, it was *the plaintiffs* who made the allegation in the first instance. (*See* R. 72, Page ID # 658.) At the Rule 12(b)(6) stage, the court is obligated to accept all well-pleaded allegations in a complaint as true. The plaintiffs cannot direct the court as to which well-pleaded allegations should be accepted and which should be disregarded merely because, upon further examination, some well-pleaded allegations might not be to their benefit.

have done is shown that whether Yum's standards and protocols could be described as "strict" is a question subject to reasonable debate.

The only portion of these statements that could be arguably false or misleading is Yum's statement that "[a]ny product suspected to be unsafe must immediately be pulled from distribution until safety can be assured." *See supra* at 6. As the amended complaint alleges, Yum did not immediately pull Liuhe and Yingtai poultry from distribution because according to Su it was already "too late." (*See* R. 72, Page ID # 708.)

Nevertheless, Yum's statement is not actionable because it was a statement of aspiration made in Yum's corporate Code of Conduct rather than rather an assertion of objective fact made in a public filing or press release. As the district court properly explained, a code of conduct is not a guarantee that a corporation will adhere to everything set forth in its code of conduct. Instead, a code of conduct is a declaration of corporate aspirations. (*See* R. 119, Page ID # 1453); *see also Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685–86 (D. Colo. 2007). To treat a corporate code of conduct as a statement of what a corporation will do, rather than what a corporation aspires to do, would turn the purpose of a code of conduct on its head.

**B.**

Similarly, Yum's responses to the negative publicity that began in November 2012 also do not appear false or misleading, given the facts alleged in the amended complaint. Yum *did* take the actions it outlined in these statements. It conducted spot checks on its chickens and required suppliers to conduct drug-residue inspections before KFC China would accept the chickens for distribution. To the extent the plaintiffs chastise Yum for not "keep[ing] the superior and eliminat[ing] the inferior suppliers to minimize the risk," it is clear from the

amended complaint that Yum did eliminate "inferior" suppliers like Liuhe even if it did not do as efficiently as the plaintiffs would have preferred. To the extent the plaintiffs take issue with the efficiency or effectiveness of Yum's monitoring system, the plaintiffs raise a claim of corporate mismanagement, not investor deception. *See Marsh v. Armada Corp.*, 533 F.2d 978, 986 (6th Cir. 1976) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.").

**C.**

The plaintiffs contend that Yum's risk disclosures were false or misleading, emphasizing the statement that food safety issues "have occurred in the past, and could occur in the future." That statement, the plaintiffs contend, and its failure to mention Liuhe and Yingtai, created a misleading impression: that it was only *possible* for food safety issues to harm investment in Yum when, in fact, food safety issues had already come to pass and were presently harming investment in Yum.

But, as several courts have concluded, "cautionary statements are 'not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." *In re FBR, Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (citations omitted). This conclusion, we believe, is one reached for good reason. Risk disclosures like the ones accompanying 10-Qs and other SEC filings are inherently *prospective* in nature. They warn an investor of what harms *may* come to their investment. They are not meant to educate investors on what harms are currently affecting the company. This is apparent from any dictionary definition of "risk." For example, Webster's Third New International Dictionary lists the primary definition of "risk" as a "*possibility* of loss, injury, disadvantage, or destruction." *Webster's Third New International Dictionary* 1961

(1986) (emphasis added). For these reasons, a reasonable investor would be unlikely to infer anything regarding the current state of a corporation's compliance, safety, or other operations from a statement intended to educate the investor on *future* harms. While there may be circumstances under which a risk disclosure might support Section 10(b) liability, this is not that case.

In any event, the plaintiffs have not alleged facts suggesting the issues with Liuhe and Yingtai were so severe that they would have resulted in financial loss for Yum. Thus, the plaintiffs have not alleged facts showing any investment risk had already materialized. *See FBR*, 544 F. Supp. 2d at 362 (finding the complaint did not sufficiently allege that defendant's noncompliance would cause financial loss) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004)). Taken alone, eight batches of chicken testing positive for drug and antibiotic residues is hardly a companywide food safety epidemic, and the plaintiffs allege no facts to suggest otherwise: they allege neither the proportion of chicken possibly contaminated nor whether Liuhe and Yingtai were two of a mere handful of suppliers or two of thousands of other suppliers. While we are obligated to construe the facts in the light most favorable to the plaintiffs, we need not speculate into existence facts which might favor the plaintiffs.

**D.**

The remaining statement can be cast aside with little fanfare: While Yum's "softer sales" were due to the negative publicity concerning its tainted poultry, as the plaintiffs allege, Novak did not commit any misstatement by simply explaining that because sales were lower, projections would be lower.

**E.**

Perhaps recognizing the futility of isolating any one statement as false or misleading, the plaintiffs, relying on out-of-circuit precedent, invite us to focus on the *overall impression* created by Yum's statements. Appellee Reply Br. at 1. According to the plaintiffs, the sum total of Yum's statements—touting its standards and protocols, failing to disclose issues with Liuhe and Yingtai, detailing its food safety action items—was what created a "misleading impression of an effective monitoring system." Appellant Br. at 15.

We decline the plaintiffs' invitation as it is based on a misinterpretation of the case law. Other circuits do *not* forego a statement-by-statement analysis of objective falsity in favor of analyzing the overall impression made by a set of statements. Rather, other circuits, like this circuit, undertake a statement-by-statement analysis. In doing so, they ask not only whether the statement is literally true but also whether the statement creates an impression that is false by, for example, impliedly asserting an objective fact that is false. As the Ninth Circuit has explained, the complaint "must demonstrate that a *particular statement*, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) (emphasis added) (quotation omitted); *see also* 15 U.S.C. § 78u-4(b)(1) (requiring the complaint to "specify *each* statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" (emphasis added)). Because each statement is neither literally false nor created a false impression about the effectiveness of Yum's monitoring system, we AFFIRM the district court's dismissal of the amended complaint.

**V.**

In the alternative, we would affirm the district court's dismissal of the amended complaint on the ground that a strong inference of scienter has not been alleged. The facts the amended complaint alleges to establish scienter boil down to the following:

- KFC China is the "core" of Yum's business. (*See* R. 72, Page ID # 680–81.)

- In response to the negative publicity beginning in November 2012, Su made statements discussing the issues with contaminated poultry and the SIFDC results. (*See id*. at Page ID # 678–79.)

- The individual defendants paid close attention to food safety as it was important to Yum's operations. The attention paid is clear from Yum's formation of a Food Safety Council, adoption of a Code of Conduct requiring the reporting of food safety issues, and creation of a global audit system. (*See id*. at Page ID # 681–82.)

- The individual defendants had reason not to disclose the SIFDC results because doing so would have harmed Yum's financial bottom line and, in turn, their own performance-based compensation. (*See id*. at Page ID # 683–700.)

All these alleged facts establish, as the district court noted, is that Su, Carucci, and Novak had the motive (because of their overall concern with food safety and its importance to profitability and their compensation) as well as the opportunity (because of their high-level positions) to conceal any knowledge of the issues with Yingtai and Liuhe. But, as this court has made abundantly clear, "plaintiffs may plead scienter … by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 549 (6th Cir. 2009).

To be sure, some Yum employees received and reviewed the SIFDC results. The issue, however, is whether there is a strong inference that the individual defendants—Novak, Carucci, or Su—received the test results and, thus, knew or should have known that Yum's statements

discussing investment risks or touting its safety protocols were false or misleading. The amended complaint fails to include facts sufficiently tying the individual defendants to the SIFDC results like, for example, by alleging that senior officers were regularly notified of test results or that Yingtai and Liuhe supplied such a substantial proportion of KFC China's chickens that senior officers would have *had* to be aware of any issues with such major suppliers.[5]

As to corporate scienter, this court held in *Omnicare* that a corporation's state of mind in making a false or deceptive statement is assessed by reference to the state of mind of:

> [1] The individual agent who uttered or issued the misrepresentation; [2] Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance; [or 3] Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance of issuance ….

*Omnicare*, 769 F.3d at 476 (citation omitted).

Because the amended complaint has not established that Novak, Carucci, or Su (senior officers falling within the third *Omnicare* category) acted with scienter, the plaintiffs would need to establish scienter on the part of another agent, falling into one of the *Omnicare* categories, to successfully allege corporate scienter. This the plaintiffs have not done. Though some Yum employees were aware of the issues with Liuhe and Yingtai, the amended complaint alleges no facts to suggest it was those employees who prepared or were otherwise involved in making the allegedly false or misleading statements at issue. As such, the plaintiffs have not plausibly alleged scienter on the part of Yum the corporate entity and have not made out a sufficient claim of Section 10(b) or Rule 10b-5 liability.

---

[5] The only fact alleged in this regard is that another supplier, the Shanxi Suhai Group, constituted 1 percent of the overall supply. (*See* R. 72, Page ID # 712.)

**VI.**

Because Yum has not sufficiently alleged a Section 10(b) violation, there is no primary violation to support Section 20(a) liability with respect to any of the individual defendants.

**VII.**

For the foregoing reasons, we AFFIRM the district court's dismissal of the amended complaint.