NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0405n.06

Case No. 14-5696

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
Jun 04, 2015
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| PENSION FUND GROUP, consisting of Norfolk County Retirement System, Plymouth County Retirement System and Oklahoma Police Pension & Retirement System; POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, <br><br> Plaintiffs-Appellants, <br><br> and <br><br> ARTHUR BENNING, JR., <br><br> Plaintiff, <br><br> v. <br><br> TEMPUR-PEDIC INTERNATIONAL, INC.; MARK A. SARVARY; DALE E. WILLIAMS, <br><br> Defendants-Appellees. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |

BEFORE: KEITH, COOK, and DONALD, Circuit Judges.

COOK, Circuit Judge.    After posting record sales for five straight quarters, mattress manufacturer Tempur-Pedic International, Inc.'s business declined in the second quarter of 2012. Plaintiffs-Appellants—a group of pension funds who purchased Tempur-Pedic stock before the

price-per-share fell nearly seventy-five percent over a seven-week period—filed a consolidated class-action complaint against Defendants-Appellees Tempur-Pedic, president and chief executive officer Mark A. Sarvary, and executive vice president and chief financial officer Dale E. Williams (collectively, "Tempur-Pedic") on behalf of all investors who purchased Tempur-Pedic common stock between January 25, 2012, and June 5, 2012 ("the Class Period"). The complaint alleges that Tempur-Pedic misled investors by issuing rosy financial projections and failing to disclose the company's deteriorating competitive position.

The district court dismissed the complaint for failure to state a plausible claim of securities fraud. We AFFIRM.

I.

Tempur-Pedic manufactures and distributes viscoelastic (i.e., memory-foam) mattresses and pillows. Its primary competitors—Sealy, Serta, and Simmons—historically sold inner-spring mattresses, which accounted for the bulk of mattresses sold in the United States. Tempur-Pedic, in contrast, targets the "specialty premium" market for non-inner-spring mattresses that retail for at least $1,000.

In April 2011, Serta launched its competing "iComfort" gel-foam mattress line. According to the complaint, several iComfort mattresses cost less than Tempur-Pedic's cheapest model, and Serta's advertising touted the gel-based iComfort's technological superiority over traditional memory-foam mattresses. The pension funds contend that Tempur-Pedic's management grew concerned about Serta's inroads in the memory-foam market even though Tempur-Pedic's sales continued to grow in the aggregate throughout 2011. According to a former Tempur-Pedic business development manager, sales at his retail accounts declined forty to sixty percent within a three-month period after retailers began selling the iComfort. He

provided the pension funds with company emails soliciting weekly sales reports and a document titled "iComfort Risk Analysis for Mark Meeting Sept 11" that compared Tempur-Pedic's sales at certain retailers before and after Serta introduced the iComfort. According to the pension funds, the "Risk Analysis" document shows that Tempur-Pedic's year-over-year sales grew by three percent between April and September 2011 at retailers that carried the iComfort and thirty-three percent at comparable mid-size retailers that did not. The former business development manager also disclosed that company executives learned at an August 2011 industry conference that four of the company's highest-grossing accounts planned to start carrying the iComfort in January 2012.

Notwithstanding Serta's inroads, Tempur-Pedic reported a company-record $1.4 billion in net sales in 2011—a twenty-eight percent increase over 2010. On January 24, 2012, Tempur-Pedic released financial guidance projecting that its annual net sales would grow by about fifteen percent in 2012 and total between $1.6 and $1.65 billion for the year. By mid-April, the company appeared to be on track to meet or exceed its projections: net sales for the first quarter of 2012 surpassed the previous year's first-quarter sales by eighteen percent. But business slowed soon thereafter. On June 6, the company revised its full-year guidance downward to $1.43 billion in projected net sales, explaining in a press release that "[s]ales trends in our North America business during the second quarter have been disappointing and below plan, primarily due to changes in the competitive environment, including an unprecedented number of new competitive product introductions, which have been supported by aggressive marketing and promotion." (R. 91-31, June 6, 2012 Form 8-K.)

Tempur-Pedic's stock price hit a Class Period high of $87.26 per share on April 19, 2012, before declining precipitously over the next month-and-a-half. The stock price dropped to

$66.53 on April 20 after the company adhered to its full-year guidance despite its better-than-predicted first quarter. It fell again to $48.29 per share in early May after Tempur-Pedic issued a press release announcing a Memorial Day discount on its Cloud Supreme mattress line. Finally, after the company revised its yearly projections downward on June 6, the stock price hit a Class Period low of $22.39 per share.

Ultimately, Tempur-Pedic's 2012 net sales totaled $1.4 billion. According to the pension funds, those results confirm that the initial projection ($1.6 to $1.65 billion) was "wildly off the mark and . . . had no reasonable basis in fact." They maintain that Tempur-Pedic, Sarvary, and Williams violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and related Securities and Exchange Commission (SEC) Rule 10b-5, 17 C.F.R. § 240.10b-5, by touting the company's recent successes and issuing rosy financial projections while failing to disclose that sales growth slowed at retailers carrying Serta's iComfort.

Tempur-Pedic, Sarvary, and Williams moved to dismiss the pension funds' consolidated amended complaint for failure to state a plausible securities-fraud claim. The pension funds opposed that motion and sought leave to file a second amended complaint that included two exhibits referenced in the first amended complaint. The district court granted the motion to dismiss and denied the motion to amend, finding that none of the challenged statements were actionable and that amendment would be futile. The pension funds timely appealed.

II.

We review the district court's decision to dismiss the complaint de novo, "constru[ing] the complaint in the light most favorable to the plaintiff" and "accept[ing] all well-pleaded factual allegations as true." *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477 (6th Cir. 2010).

"To state a securities fraud claim . . . , a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Frank v. Dana Corp.*, 547 F.3d 564, 569 (6th Cir. 2008) (internal quotation marks and citation omitted). A defendant is liable for omitting a fact only if he had a duty to disclose it. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005). But a defendant who speaks voluntarily on a subject when he has no duty to do so "'assume[s] a duty to speak fully and truthfully on th[at] subject.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001) (en banc) (first alteration in original) (quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998) (en banc)), *overruled on other grounds as recognized in Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 501 n.3 (6th Cir. 2013).

"A misrepresentation or an omission is material only if there is a substantial likelihood that 'a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available.'" *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)). A court may dismiss a securities-fraud action if the challenged statements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig*, 251 F.3d at 563 (quoting *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 162 (2d Cir. 2000)). Applying that standard,

> [c]ourts everywhere "have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available."

*Ford*, 381 F.3d at 570–71 (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)).

The Private Securities Litigation Reform Act of 1995 (PSLRA), Pub. L. 104-67, 109 Stat. 737, created a limited safe harbor for "forward-looking statements." *Helwig*, 251 F.3d at 547–48. Forward-looking statements covered by the Act include projections of revenues, income, and earnings-per-share; statements concerning a company's future economic performance; and statements about the assumptions underlying forward-looking statements. 15 U.S.C. § 78u-5(i)(1). Such statements are actionable as securities fraud only if (1) a reasonable investor would find the statement material, (2) the defendant failed to identify its statement as forward looking or provide "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," and (3) the defendant made the statement "with actual knowledge . . . that [it] was false or misleading." 15 U.S.C. § 78u-5(c)(1); *see also Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

III.

The pension funds allege that Tempur-Pedic, Williams, and Sarvary made numerous false and misleading statements during the Class Period. We agree with the district court that none of the challenged statements or omissions constituted securities fraud.

*A. January 24 Press Release*

On January 24, 2012, Tempur-Pedic issued a press release announcing the company's 2011 financial results and issuing financial guidance for the upcoming year. The pension funds argue that the company's financial guidance and a statement about "competitiveness" were materially false or misleading. Both arguments fail. The financial guidance falls within the

PSLRA safe harbor, and Sarvary's vague mention of "competitiveness" was immaterial corporate puffery that no reasonable investor would find important.

*1. 2012 Financial Guidance*

For the upcoming year, Tempur-Pedic projected between $1.60 and $1.65 billion in net sales and between $3.80 and $3.95 in earnings-per-diluted-share. Such guidance falls squarely within the PSLRA's definition of forward-looking statements. *See* 15 U.S.C. § 78u-5(i)(1).

The pension funds nevertheless argue that Tempur-Pedic's 2012 financial guidance was not, in fact, forward looking because it omitted how Serta had already affected the company's sales growth. But they find no support in our precedent for characterizing financial projections as representations of historical or current fact. Under the PSLRA, we ask if a statement meets the statutory definition of forward looking; if it does, we look to whether the defendant meaningfully alerted investors to the risks that might prevent it from reaching its financial targets. *See Miller*, 346 F.3d at 672, 678. In other words, we ask if Tempur-Pedic "convey[ed] substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Helwig*, 251 F.3d at 558–59.

Here, the January 24 press release warned about competitive risks and incorporated warnings in other SEC filings by reference. The press release identified numerous "risks and uncertainties that could cause actual results to differ materially" from projected results, including "industry competition." (R. 91-14, Jan. 24. 2012 Form 8-K.) The warning referred readers to the company's SEC filings, particularly the "Risk Factors" section of the company's most recent Form 10-K annual report. That report, released in January 2011, disclosed: "The mattress and pillow industries are highly competitive. Participants in the mattress and pillow industries have

traditionally competed based primarily on price." (R. 91-4, FY 2010 Form 10-K at 4.) It

mentioned Serta specifically:

> The standard mattress market in the U.S. is dominated by manufacturers of innerspring mattresses, with three nationally recognized brand names: Sealy, Serta and Simmons. These three competitors also offer premium innerspring mattresses and collectively have a significant share of the premium mattress market in the U.S. . . . [Many of our] competitors and, in particular, the three largest brands of innerspring mattresses named above, have significant financial, marketing and manufacturing resources, strong brand name recognition, and sell their products through broader and more established distribution channels. *During the past several years, a number of our competitors, including Sealy, Serta and Simmons, have offered viscoelastic mattress and pillow products.*

(*Id.* at 5 (emphasis added).) The "Risk Factor" section further explained: "[A] number of our

significant competitors offer non-innerspring mattress and viscoelastic pillow products. Any

such competition by established manufacturers or new entrants into the market could have a

material adverse effect on our business, financial condition and operating results by causing our

products to lose market share." (*Id.* at 8.)

The press release's warning about industry competition—which incorporates by

reference the Form 10-K's more thorough risk disclosures, *see Miller*, 346 F.3d at 677–78—

adequately disclosed the risk that Tempur-Pedic would fail to sustain its current rate of growth

due to increased competition from Serta for share of the memory-foam market. We found

similar disclosures meaningful in *Miller v. Champion Enterprises, Inc.*, rejecting the argument

that a model-home company should have disclosed its loan to a struggling retailer whose default

might leave it saddled with excess inventory:

> The July 8 letter cited Champion's risk disclosures in its 1998 Form 10-K, which included a risk related to inventory levels of manufactured housing retailers. Additionally, the letter itself contained warnings that "housing stocks in general have underperformed the markets in 1999," and that "in certain regions we see too many retail locations, suggesting an over supply of retail inventory of homes in that region." Plaintiff argues that Champion should also have disclosed the nature of their loans to Parker Homes. This goes too far. Champion disclosed the exact

> risk that occurred in this situation: excess retailer inventory that could lead to negative economic effects on Champion. Champion is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk.

346 F.3d at 677–78. Similarly, having disclosed the risks posed by competition, Tempur-Pedic was not required to disclose its internal analyses of how a specific competitor affected sales to claim safe-harbor protection.

The pension funds' argument to the contrary finds no support in *Helwig v. Vencor, Inc.*, which denied safe-harbor protection to a healthcare provider's "cursory and abstract" statements disclaiming any knowledge of how a pending federal law might affect its business. 251 F.3d at 558–59. *Helwig* stands for the proposition that a defendant fails to provide meaningful cautionary language when it refuses to identify or address imminent risks; it does not address the level of specificity required once a defendant discloses such risks. *Id.* at 559. *Miller*, not *Helwig*, controls our consideration of Tempur-Pedic's cautionary language.

Further, Tempur-Pedic's warning remained meaningful even if sales at certain retailers grew at a slower rate in the months leading up to the January 24 press release. Although several district courts have denied safe-harbor protection when defendants' risk disclosures treat currently existing conditions as mere possibilities, they have done so only where the warnings clearly misrepresented facts. *See, e.g.*, *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685 (E.D. Mich. 2004) ("Defendants' statement that 'there can be no assurance that IBM will not choose to offer significant competing products in the future,' implied that IBM's development of competing software was a possibility as opposed to an actuality, and therefore, this statement does not qualify as *meaningful* cautionary language."). We decline to find Tempur-Pedic's risk disclosures inadequate merely because the company's growth appeared to slow—but not reverse—due to competition in 2011. Holding otherwise would deny safe-harbor protection any

time a plaintiff could show that a defendant perceived a general negative trend, even if the trend had not yet affected its bottom line. Such a rule would undermine the PSLRA's pro-disclosure objective. *See Helwig*, 251 F.3d at 559.

### 2. Sarvary's "competitiveness" statement

The January 24 press release also attributed the following comment to Sarvary: "In 2011, we delivered strong financial performance, strengthened our competitiveness and implemented a range of strategic growth initiatives." (R. 91-14, Jan. 24, 2012 Form 8-K.) The pension funds contend that Sarvary's statement was false or misleading because he knew that Tempur-Pedic's growth slowed at retailers carrying the iComfort. But Sarvary's unspecific reference to the company's "competitiveness" is immaterial as a matter of law: the term is "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe*, 399 F.3d at 671. The pension funds fail to identify a "standard against which a reasonable investor could expect [Sarvary's reference to competitiveness] to be pegged." *Id.*

## B. January 24 Earnings Call

Williams and Sarvary also discussed the company's 2011 results and 2012 guidance during a January 24 "earnings call." The pension funds challenge several of their statements.

### 1. Statements about growth and competition

Sarvary and Williams both spoke about the company's recent successes during the call. For instance, Sarvary said: "Sales growth [in 2011] was strong, both in the U.S. and overseas, and we have gained share domestically and around the world." (R. 91-15, Jan. 24, 2012 Earnings Call Tr. at 4.) Williams informed investors that the company "experienced improving growth rates by month" during the final quarter of 2011 and that "sales trends through the first

23 days [of the first quarter of 2012] have continued to be strong." (*Id.* at 7.) Later, he said: "We're very pleased with how the business is performing . . . . Both the international business and the North American business are performing well but it's early in the quarter and this can be a fluctuating industry so we don't take 23 days lightly but we also don't project it out forever." (*Id.* at 10.)

Although most of the analysts on the call asked about Tempur-Pedic's recent performance and future plans, one asked whether Sarvary and Williams perceived a connection between competitors' recent launches and the overall growth in consumer demand for memory-foam mattresses. (*Id.* at 14–15.) Sarvary acknowledged that Tempur-Pedic operated in a "tough market with some very good competitors in it and they will continue to introduce products." (*Id.* at 15.) He attributed both Tempur-Pedic's recent successes and the increase in memory-foam sales generally to "customers [who] are increasingly prepared to pay a premium for a product that will enable them to sleep better." (*Id.*)

The pension funds do not contend that Tempur-Pedic misstated its sales figures in 2011 or early 2012. Instead, citing the duty to "provide complete and non-misleading information with respect to subjects on which [one] undertakes to speak," *Helwig*, 251 F.3d at 561, the pension funds argue that Williams and Sarvary misled investors by speaking about growth and competition without disclosing how Serta specifically affected Tempur-Pedic's growth rate. They also contend that Sarvary's response to the analyst's question about competition falsely implied that Tempur-Pedic maintained a competitive edge over Serta.

But we do not read *Helwig* to require Williams and Sarvary to disclose that Tempur-Pedic's sales might have grown more without competition from Serta's iComfort once they chose to speak about the company's recent positive results or competition generally. Holding an

earnings call did not obligate them to disclose all facts contributing to or undermining the company's recent successes. "Such a rule would require almost unlimited disclosure on any conceivable topic related to an issuer's financial condition whenever an issuer released any kind of financial data." *Miller*, 346 F.3d at 682.

> 2. *Statements forecasting that the current state of affairs would "continue"*

The pension funds also challenge Williams's statement that Tempur-Pedic's domestic business "will continue to perform" and Sarvary's statement that the company would look "to capitalize on this fundamental trend [of consumers buying specialty mattresses] by continuing to have products that are both genuinely differentiated and preferred by consumers." (R. 91-15, Jan. 24, 2012 Earnings Call Tr. at 9, 15.)

To the extent that Williams and Sarvary's statements predict that the current state of affairs will continue into the future, they are protected by the PSLRA safe harbor. *See Miller*, 346 F.3d at 677. At the beginning of the call, a Tempur-Pedic executive cautioned investors that any forward-looking statements, including financial projections, fell within the safe harbor, added that "economic, competitive, operating and other factors" could cause actual results to differ materially from projected results, and referred investors to the annual Form 10-K report discussed above. (R. 91-15, Jan. 24, 2012 Earnings Call Tr. at 3.) Those warnings meaningfully warned investors of the risks of purchasing Tempur-Pedic stock.

Moreover, to the extent that Williams and Sarvary's statements suggest that Tempur-Pedic was currently "performing" and producing customer-preferred mattresses, such representations are the kind of "loosely optimistic" statements that we have elsewhere found immaterial. *See City of Monroe*, 399 F.3d at 670–72 (finding general claims about quality and

safety immaterial); *Ford*, 381 F.3d at 570–71 (finding self-praising statements about "quality, safety, and corporate citizenship" immaterial).

*C. January 30 FY 2011 Annual Report (Form 10-K)*

On January 30, the company filed its annual Form 10-K for the period ending December 31, 2011. The pension funds contend that the report contains two false statements.

First, the pension funds challenge the statement: "The TEMPUR-Cloud® collection continues to be well received by retailers." (R. 91-8, FY 2011 Form 10-K at 29, 38.) But they have not alleged facts that would plausibly render the "well received" statement misleading, and any evidence that four major Tempur-Pedic retailers decided to sell Serta's iComfort has no bearing on their attitude toward Tempur-Pedic's TEMPUR-Cloud® line.

Second, the pension funds suggest that Tempur-Pedic spoke falsely when it claimed to "provide strong channel profits to our retailers and distributors which management believes will continue to provide an attractive business model for our retailers and discourage them from carrying competing lower-priced products." (*Id.* at 38.) They argue that the statement, among others, "drew a false and misleading parallel between their successful results in 2011 and future results." As noted above, the word "continue" renders the statement both a representation of current fact and a forward-looking projection. To the extent that the statement predicted how retailers might respond to incentives in the future, the pension funds have not argued that Tempur-Pedic failed to adequately warn investors of the risks underlying its channel-profit strategy. Further, to the extent the statement represents management's current opinion, it is immaterial as a matter of law. The complaint includes no facts that would tend to show that management either did not believe that strong channel profits could have that effect or lacked a factual basis for that belief. *See Helwig*, 251 F.3d at 562 ("'Material statements which contain

the speaker's opinion are actionable . . . if the speaker does not believe the opinion and the opinion is not factually well-grounded.'" (quoting *Mayer v. Mylod*, 988 F.2d 635, 639 (6th Cir. 1993))).

*D. February 22 Webcast*

During Tempur-Pedic's "Investor Day" webcast in mid-February, Sarvary allegedly referred to Tempur-Pedic's "consumer preferred" product line. (R. 87, Am. Compl. at ¶ 114.) That statement is immaterial puffery. As we have noted elsewhere, "[a]ll public companies praise their products," and Sarvary's statement that the company sells a "consumer preferred" product is the sort of "rosy affirmation commonly heard from corporate managers" that we hold immaterial as a matter of law. *Ford*, 381 F.3d at 570–71.

During the same webcast, Sarvary allegedly said that the company had grown and continued to grow, and added that there were "a variety of reasons why we're very confident [in projections of continued] growth." (R. 87, Am. Compl. at ¶ 114.) The pension funds allege no facts tending to show that the company lacked confidence in continued growth as of February 22 or had no reasonable basis for that confidence. *See Helwig*, 251 F.3d at 562. According to their complaint, Tempur-Pedic's internal data showed that its growth slowed at retailers carrying the iComfort, not that it stopped or reversed course.

*E. March 5 Presentation*

Williams continued to tout Tempur-Pedic's successes during the company's presentation at the Raymond James Institutional Investors Conference on March 5, 2012. He told participants: "2011 [was] another great year for the company . . . just a phenomenal year for the company, very pleased with the performance, and we look for that kind of growth opportunity to continue into the long-term in the future." (R. 91-17, Mar. 5, 2012 Conf. Tr. at 3.) Later he

said: "2011 was a record year on every measure of the business. And we are looking for continued growth." (*Id.* at 5.) With respect to future growth, he advised, "We continue to see . . . a long runway of opportunity, to continue to improve gross margins in the business." (*Id.*)

The pension funds contend that Williams misled investors by linking the company's recent successes to its future prospects. But his statements concerning expected future growth are forward looking and were accompanied by meaningful cautionary language that insulated them from liability. Although the company did not issue a formal warning about forward-looking statements, Williams began his presentation by saying: "As usual—we may say something today that's forward-looking, so it's under the safe harbor provisions." (*Id.* at 2.) He described his comments as a "very condensed version" of the Investor Day webcast and referred participants to the full presentation on the company's website, which warned about industry competition and referred to the more thorough disclosures in the company's SEC filings.

*F. April 19 Press Release*

On April 19, Tempur-Pedic issued a press release announcing better-than-expected first-quarter results and reaffirming its financial guidance for the full year. The pension funds contend that the reaffirmed guidance falls outside the safe harbor because Tempur-Pedic failed to adequately amend its cautionary language as the threat posed by Serta increased. We have never held that a company's repeated use of similarly worded warnings renders them meaningless. Further, Tempur-Pedic updated its warning in its 2011 Form 10-K to disclose that "[d]uring the past several years, a number of our competitors, including Sealy, Serta and Simmons, have offered viscoelastic mattress and pillow products, *including several new prominent product introductions in 2011*." (R. 91-8, FY 2011 Form 10-K at 5 (emphasis added).) That new

language adequately warned investors of the risks posed by Serta's launch of the iComfort in April 2011.

*G. April 19 Earnings Call*

Shortly after the company issued the press release reaffirming its full-year guidance, Sarvary and Williams answered several questions about competition during an earnings call with industry analysts. Sarvary acknowledged from the outset that the company faced "significant new competitive launches and aggressive price promotion in the industry[] as it has moved increasingly toward non-spring mattresses." (R. 91-20, Apr. 19, 2012 Earnings Call Tr. at 4.)

One analyst asked whether increased competition influenced the decision to adhere to their original guidance after a better-than-expected first quarter:

> I think you've had some branded competition in this space for almost a year now. Is there something that's changed in the landscape in the last three months or so? Is the competition getting more price-competitive? Have there been new entrants in the last three months? Or, has something changed recently that's caused you to tone down your comments today?

(*Id.* at 10.) Sarvary responded that "there's been competition forever, and the competition, we've always said, is very strong," and suggested that the company's competitors were "very promotional and very focused on price." (*Id.*)

Another analyst pressed Williams and Sarvary to address whether they thought the growing demand for specialty mattresses reflected a "different approach that's being taken by some of your competitors." (*Id.* at 12–13.) Sarvary replied that the trend "provides us an opportunity" and "it's happening something like we expected." (*Id.* at 13.)

Relying on *Helwig*, the pension funds argue that Williams and Sarvary incurred a duty to disclose Serta's adverse effect on Tempur-Pedic's sales when they chose to speak about competition on April 19. But they fail to explain how statements acknowledging "significant

new competitive launches" and "strong competition" required them to also disclose Serta's specific effects on their business. *Helwig* requires defendants to disclose information "essential to complete a picture they had only partially revealed." 251 F.3d at 560. Here, Williams and Sarvary spoke fully when they acknowledged increased competition; they were not required to mention specific competitors to avoid misleading investors.

IV.

We discern no error in the district court's dismissal of the amended complaint or abuse of discretion in its order denying the pension funds' motion to file a second amended complaint. Amendment was futile because the proposed second amended complaint included the same factual and legal allegations as the first amended complaint, and the district court properly considered the new exhibits appended to the proposed amended complaint when ruling on the motion to dismiss. We AFFIRM.