Nwanguma v. Trump, 903 F.3d 604, 607 (6th Cir. 2018).
Where, however, a complaint alleges fraud in the purchase or sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, a heightened pleading standard is mandated by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81-82, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) ; Miller v. Champion Ents. Inc., 346 F.3d 660, 686 (6th Cir. 2003).[5] Under the PSLRA, "the complaint *908 shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and shall "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).
III. Application of Law
The PSLRA, as Defendants are quick to point out, can be an "elephant-sized boulder blocking [a securities fraud] suit[.]" In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 461 (6th Cir. 2014). But this does not mean the boulder cannot be circumnavigated, pushed aside, or at least squeezed past so as to allow a plaintiff to open the doors to discovery. Weiner has done so in this case.
Contrary to Defendants' contention, when the allegations in the First Amended Complaint are accepted as true,[6] this litigation is not "based on nothing more than a company's announcement of bad news," nor is Weiner improperly trying to "turn news of competition Tivity would face into a securities fraud complaint." (Doc. No. 39 at 6). Instead, Weiner alleges that Tivity thought it important enough over the years to warn there would be an investment risk if one of its health-plan customers chose to develop its competing program, yet when one of its largest customers made that possibility a reality, Tivity actively concealed that information from its investors and suggested that the relationship with that customer was as good as it had been in the past.
A. Materiality and Actionable Statements or Omissions
Tivity first moves to dismiss on the grounds that the "Complaint fails to allege that UHC's competing Optum program was material to Tivity's bottom line, and, thus, as the Sixth Circuit holds, the Complaint fails to state a claim and should be dismissed." (Doc. No. 39 at 13). As support, Tivity discusses three Sixth Circuit cases that it deems to be "particularly instructive" on the issue of materiality. (Id.).
Pension Fund Group v. Tempur-Pedic International, Inc., 614 F. App'x 237 (6th Cir. 2015) involved a securities complaint filed against Tempur-Pedic after stock prices dropped precipitously when its competitor Serta made significant inroads into the viscoelastic (memory-foam) bed and pillow market. While Tivity claims Tempur-Pedic"alleged a similar theory to the one at issue here," (Doc. No. 39), that theory was based on an entirely different factual pattern.
Like here, Tempur-Pedic disclosed that competition was a known "risk factor," and the Sixth Circuit affirmed dismissal at least in part because "Tempur-Pedic was not required to disclose its internal analyses of how a specific competitor affected *909 sales," nor were "Tempur-Pedic's risk disclosures inadequate merely because the company's growth appeared to slow - but not reverse - due to competition[.]" Id. at 244. Unlike here, however, Tempur-Pedic acknowledged that competition was already taking place. Specifically, in a January 2011 Press Release, Tempur-Pedic informed the investing public that "[d]uring the past several years, a number of our competitors, including Sealy, Serta and Simmons, have offered viscoelastic mattress and pillow products." Id. at 243. This is a critical difference as evidenced by the Sixth Circuit's distinguishing cases where dismissal was denied "when defendants risk disclosures treat[ed] currently existing conditions as mere possibilities" and "where the warnings clearly misrepresented facts." Id. In this regard, the Sixth Circuit quoted In re Compuware Sec. Litig., 301 F.Supp.2d 672, 685 (E.D. Mich. 2004) (emphasis added), in which the district court observed that "Defendants' statement that 'there can be no assurance that IBM will not choose to offer significant competing products in the future,' implied that IBM's development of competing software was a possibility as opposed to an actuality, and therefore, this statement does not qualify as meaningful cautionary language." Likewise here, Weiner is complaining about Defendants intentionally ignoring or distorting reality. See Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 986 (9th Cir. 2008) (observing statement that "speaks entirely of as-yet-unrealized risks and contingencies" does not "alert[ ] the reader that some of these risks may already have come to fruition); In re Snap Inc. Sec. Litig., No. 217CV03679SVWAGR, 2018 WL 2972528, at *6 (C.D. Cal. June 7, 2018) (finding that "hypothetical risk disclosures - e.g. , Instagram Stories 'may be directly competitive,' - do not absolve Defendants of their duty to disclose known material adverse trends currently affecting Snap's user growth").
Next, Tivity cites Zaluski v. United American Healthcare Corp., 527 F.3d 564 (6th Cir. 2008) as holding that there is "no duty to disclose information that might put a contract at risk," and a complaint fails when it is "devoid of allegations that the company thought that the [illegal] payment put the contract at risk otherwise would have a negative impact. " (Doc. No. 39 at 14)(emphasis in original). That precise language, however, appears nowhere in Zaluski. What the Sixth Circuit actually said, in the context of the potential loss of a contract based upon the payment of bribes, was that there was no duty to disclose where there was no "evidence of internal investigations and reports that gave rise to a duty to disclose" and there was "no evidence that [the company] anticipated that the .. payments would lead to a termination or modification of its contract." 527 F.3d at 574. Here, of course, the allegations are that Tivity was hardly nonplussed when it learned of UHC's competing program. It formed a committee specifically to address the problem, and implemented a communication plan for those who it actually chose to inform.
Finally, Defendants rely on Bondali v. YumA Brands, Inc., 620 F. App'x 483 (6th Cir. 2015), a case involving Kentucky Fried Chicken's failure to inform its investors that batches of chicken being supplied to a China subsidiary had tested positive for drug and antibiotic residues. Defendants claim that "the Sixth Circuit has unambiguously and definitively foreclosed the type of risk disclosure at issue in this case" (Doc. No. 39 at 16) because "cautionary statements are 'not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results," 620 F. App'x at 491. However, Bondali is unpublished and *910 therefore not "binding precedent" or "binding authority," (Doc. No. 50 at 6), as Defendants claim in their reply brief. See Chevalier v. Estate of Barnhart, 803 F.3d 789, 796 n.4 (6th Cir. 2015) (observing that unpublished decisions are "binding only on the parties"); Crump v. Lafler, 657 F.3d 393, 405 (6th Cir. 2011) stating that "[u]npublished decisions in the Sixth Circuit are, of course, not binding precedent on subsequent panels"); Sheets v. Moore, 97 F.3d 164, 167 (6th Cir. 1996) (noting that unpublished opinions "carry no precedential weight ... [and] have no binding effect on anyone other than the parties to the action"). Besides, the court in Bondali explicitly recognized that "there may be circumstances under which [such] a risk disclosure might support Section 10(b) liability." Bondali, 620 F. App'x at 491. Thus, it can hardly be said, as Defendants claim, that " Bondali requires dismissal." (Doc. No. 39 at 16).
Regardless of what distinctions there may be between this case and the ones relied upon by Defendants, none of those cases suggested a change in the law surrounding materiality. To the contrary, both Tempur-Pedic, 614 F. App'x at 242 and Zaluski, 527 F.3d at 571 reaffirm the "total mix" standard articulated by the Supreme Court in Basic Inc. v. Levinson, 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).[7]
B. Safe Harbor
Defendants next seek shelter in the safe harbor provisions of the PSLRA for three allegedly forward looking statements. Those statements are (1) the April 27, 2017 Press Release in which Tramuto is quoted as saying that "[t]hrough our A-B-C-D strategy ... we believe we are well positioned to strengthen our market leadership program in serving the 50-plus market"; (2) a July 27, 2017 Press Release that stated, "[w]e believe we have a tremendous long-term opportunity to increase participation in both our SilverSneakers and Prime programs[8] within each program's existing base of millions of members who are already eligible to enroll and participate"; and (3) an October 26, 2017 conference call in which Tramuto stated that, "[w]e expect to benefit from improved performance across our functional areas. For example, we achieved a contract renewal rate of over 99% for last fall." (Doc. No. 39 First Amended Complaint ¶¶ 60, 70, 76).
The PSLRA contains a safe-harbor provision for a forward-looking statement whereby a defendant "is liable for such statements only if they were material; if the defendant 'had actual knowledge that the statements were false or misleading'; and if the defendant did not identify the statements as forward-looking or insulate them with 'meaningful cautionary language.' " In re Ford, 381 F.3d at 568. "[F]or 'forward-looking statements' that are accompanied by meaningful cautionary language, the ... the safe harbor provided for in the PSLRA makes the state of mind irrelevant." Miller, 346 F.3d at 672 (citing 15 U.S.C. § 78u-5(c)(1)(A) ). "In other words, if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected regardless of the actual state of mind." Id.[9]
*911 A company that chooses to speak, therefore, is protected against failed projections provided it identifies " 'important factors that could cause actual results to differ materially from those in the forward-looking statements.' " Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001) (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i) ). While "a company need not list all factors, [t]he cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements[.]" Id. at 558-9. In observations worthy of repeating in some detail, the United States Court of Appeals for the District of Columbia has recently observed:
[C]autionary language cannot be "meaningful" if it is "misleading in light of historical fact[s]," ... "that were established at the time the statement was made[.]" Such statements are neither "significant" nor of "useful quality or purpose." Indeed, the Conference Report [to the PSLRA] states that "[a] cautionary statement that misstates historical facts is not covered by the safe harbor." A warning that identifies a potential risk, but "impl[ies] that no such problems were on the horizon even if a precipice was in sight," would not meet the statutory standard for safe harbor protection. If a company were to warn of the potential deterioration of one line of its business, when in fact it was established that that line of business had already deteriorated, then, as the Second Circuit explained, its cautionary language would be inadequate to meet the safe harbor standard. By analogy, the safe harbor would not protect from liability a person " 'who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.' " ... "As this court [has] noted, there is an important difference between warning that something "might" occur and that something "actually had" occurred.
Because Congress required that cautionary statements warn of "important factors that could cause actual results to differ," the cautionary language need not necessarily "mention the factor that ultimately belies a forward-looking statement." That is, Congress did not require the cautionary statement warn of "all " important factors, so long as "an investor has been warned of risks of a significance similar to that actually realized," such that the investor "is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." Perfect clairvoyance may be impossible because of events beyond a company's control of which it was unaware. Congress required that a company must warn of factors that "[h]av[e] much import or significance" and "carry[ ] with [them] great or serious consequences," and which are "likely to have a profound effect on success[.]"
We join our sister circuits' reasoned analysis of the safe harbor requirement that forward-looking statements be accompanied by "meaningful cautionary statements." The words Congress chose provide instructive guidance and the remaining ambiguity in application is informed by and resolved in view of Congress's purpose to protect companies from "[a]busive litigation," while still *912 providing investors the information they require to make reasoned decisions[.]
The question, then, is whether the Company's statements ... were accompanied by warnings specific to the Company and tailored to the specific forward-looking statements, not mere boilerplate, and consistent with the historical facts when the statements were made, thereby carrying out Congress's purpose to ensure that investors have the information they need to make an informed decision on whether or not to invest, or remain invested, in the Company.
In re Harman Int'l Indus., Inc. Sec. Litig., 791 F.3d 90, 102-03 (D.C. Cir. 2015).
Accepting the allegations in the Amended Complaint as true, the Court must answer the question posed in In re Harman in the negative. Notwithstanding Tivity's arguments to the contrary, the forward-looking statements at issue[10] were provided in the context of cautionary statements that were boilerplate, not meaningful, and inconsistent with the historical facts.
Tivity argues that its April 27, 2017, July 27, 2017, and October 26, 2017 press releases all cautioned investors that its forward-looking statements could be "affected by certain risks and uncertainties," including: (1) "the Company's ability to renew and/or maintain contracts with its customers under existing terms or restructure these contracts on terms that would not have a material negative impact on the Company's results of operations"; (2) "the Company's ability and/or the ability of its customers to enroll participants and to accurately forecast their level of enrollment and participation in the Company's programs in a manner and within the time-frame anticipated by the Company"; (3) "the risks associated with deriving a significant concentration of revenues from a limited number of customers" (4) "the Company's ability to effectively compete against other entities, whose financial, research, staffing, and marketing resources may exceed the Company's resources." (Doc. No. 39 at 19). These statements, coupled with its 2016 Annual Report, Tivity submits, "were certainly sufficient to warn investors about the risks posed to revenue by potential actions taken by health plan customers." Id.
Tivity's argument may be valid to an extent, but, as previously noted, cautionary statements must be substantive and tailored. In re Harman, 791 F.3d at 103 ; OFI Asset Mgmt. v. Cooper Tire & Rubber, 834 F.3d 481, 491 (3d Cir. 2016) ; Helwig, 251 F.3d at 559. This "calls for 'substantive company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.' " Slayton v. Am. Exp. Co., 604 F.3d 758, 772 (2d Cir. 2010) (quoting Southland Secs. Corp. v. INSpire Ins. Sols., Inc., 365 F.3d 353, 372 (5th Cir. 2004) ).
According to the allegations in the Amended Complaint, before the FY16 Form 10-K was filed on March 6, 2017 and the first Press Release on April 27, 2017, UHC had already: (1) started operating Optum Fitness Advantage in New Jersey and Washington; and (2) sent letters to fitness centers in other states. Then, by the time of the July 27, 2017 press release, Tivity allegedly knew UHC would expand competition in at least nine other states, and formed a special committee to address *913 the problem. And, by the time of the October 26, 2017 conference call, Tivity developed and implemented a communications plan to attempt to contain the UHC threat, informed its fitness centers not to make any statements about UHC's entry into the market, or even identify UHC as the competitor. Given these historical facts, warnings about potential actions that might be taken in the future by health plan customers were not meaningful.
C. Falsity
Outside of the safe harbor, Tivity briefly argues that the three statements Tramuto made on April 27, 2017 regarding contract renewal are not actionable. That is, "the Complaint's failure to allege any facts demonstrating the falsity of the statements regarding the new UHC contract requires dismissal of these statements from the Complaint." (Doc. No. 39 at 20). Though not entirely clear, this argument appears be based upon the premise that the statements about contract renewal were "hard," and not "soft" information.
"[A] company has a duty to disclose hard information but not soft information unless other criteria are met." Zaluski, 527 F.3d at 572. "Hard information is typically historical information or other factual information that is objectively verifiable. Such information is to be contrasted with 'soft' information, which includes predications and matters of opinion." Id. (quoting In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997) ).
Contrary to Tivity's assertion, the Amended Complaint does allege that the renewed contract terms with UHC were less favorable than before because SilverSneakers would be offered in fewer UHC Medicare Advantage markets. (Doc. No. 32, Amended Complaint ¶ 67). Besides, Tramuto's statements - to wit, "a renewal that was completed on favorable terms," "we renewed on favorable terms, we "are very pleased with the terms," and "it's favorable terms" - are more likely matters of opinion than hard information and "a defendant may choose silence or speech based on the then-known factual basis, but it cannot choose half-truths." In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 569 (6th Cir. 2004). Thus, "[o]nce a company has chosen to speak on an issue - even an issue it had no independent obligation to address - it cannot omit material facts related to that issue so as to make its disclosure misleading." Williams v. Globus Med., Inc., 869 F.3d 235, 241 (3d Cir. 2017). Here, not only did Tramuto fail to disclose UHC's entry into the marketplace, he twice deflected inquiry into the matter from an analysts during the conference call.
D. Scienter
Finally, Tivity argues that the Amended Complaint fails to sufficiently allege scienter. Its argument here is two-fold: (1) viewed holistically, the allegations fail to establish the requisite strong inference of scienter, and (2) the First Amended Complaint fails to plead the Helwig factors.
Turning to the latter point first, the Sixth Circuit in Helwig held that the facts alleged in a securities complaint must present a "strong inference" of reckless behavior or knowing conduct, "meaning that scienter must be the most plausible inference that could be drawn from the facts." Frank v. Dana Corp., 646 F.3d 954, 957 (6th Cir. 2011) ( Frank II ). The court then identified "several factors usually relevant to scienter." Helwig, 251 F.3d at 552. These "non-exhaustive list of factors" include:
(1) insider trading at a suspicious time or in an unusual amount;
*914 (2) divergence between internal reports and external statements on the same subject;
(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;
(4) evidence of bribery by a top company official;
(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;
(6) disregard of the most current factual information before making statements;
(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;
(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and
(9) the self-interested motivation of defendants in the form of saving their salaries or jobs
Id. (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 194 (1st Cir. 1999) ). Because Weiner focuses almost exclusively on the unusual trading that occurred before UHC's entry into the market was announced, Defendants assert that his Amended Complaint is subject to dismissal.
Helwig, however, preceeded Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). There, the Supreme Court noted that "Congress left the key term 'strong inference' undefined" in the PSLRA, and concluded that "the court must take into account plausible opposing inferences" explaining:
The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]"... Yet the inference of scienter must be more than merely "reasonable" or "permissible"-it must be cogent and compelling, thus strong in light of other explanations.
551 U.S. 308, 323-24, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (internal citation omitted). Accordingly, a securities "complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324, 127 S.Ct. 2499. In making that determination, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." Id. at 325, 127 S.Ct. 2499.
Because the Supreme Court in Tellabs rejected the "most plausible requirement" utilized in Helwig, Wiener argues that "reliance on the Helwig factors is unavailing." (Doc. No. 47 at 25, n. 26). As support, he cites Frank II, wherein the Sixth Circuit observed:
In the past, we have conducted our scienter analysis in section 10(b) cases by sorting through each allegation individually before concluding with a collective approach. Cf. Konkol, 590 F.3d at 397-404 ; Ley v. Visteon Corp., 543 F.3d 801, 809-14 (6th Cir.2008) ; PR Diamonds, Inc., 364 F.3d at 684. However, we decline to follow that approach in *915 light of the Supreme Court's recent decision in Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). There, the Court provided for us a post- Tellabs example of how to consider scienter pleadings "holistically" in section 10(b) cases. Id. at 1323-25 (quoting Tellabs, 551 U.S. at 326, 127 S.Ct. 2499 ) (internal quotation marks omitted). Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, did not parse out the allegations for individual analysis. Id. at 1324-25. This is the only appropriate approach following Tellabs 's mandate to review scienter pleadings based on the collective view of the facts, not the facts individually. Tellabs, 551 U.S. at 322-23, 127 S.Ct. 2499 ("The inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."). Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after Tellabs, conducting an individual review of myriad allegations is an unnecessary inefficiency. Consequently, we will address the Plaintiffs' claims holistically.
Frank II, 646 F.3d at 961. Although sorting through each allegation is time-consuming and likely unnecessary in light of Tellabs, the Court does not read Franks II as pretermitting consideration of the Helwig factors when determining whether the facts alleged, taken collectively, give rise to a strong inference of scienter that is at least as compelling as any opposing inference. Indeed, post- Tellabs, some Sixth Circuit decisions have specifically addressed the Helwig factors in securities fraud cases. See Dougherty v. Esperion Therapeutics, Inc., 905 F.3d 971, 981 (6th Cir. 2018) (noting that "three of the Helwig factors weigh in Plaintiffs' favor" and "[n]one of the other Helwig factors apply in this case"); Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1041 (6th Cir. 2016) ("Considering all pleaded allegations holistically, Tellabs, ... and applying the Helwig factors"); Konkol v. Diebold, Inc., 590 F.3d 390, 399 (6th Cir. 2009) (post- Tellabs addressing each of the Helwig factors) Here, when the factual allegations are considered collectively and holistically, there is a strong inference that Defendants acted with at least reckless disregard for, if not knowledge of, the misleading nature of their statements that is at least as compelling as any innocent inference. This is true even when considering the Helwig factors.
The parties' arguments for and against scienter are not elaborate. On the one hand, Defendants argue that, assuming that Tivity had knowledge about UHC's Optum Fitness Advantage program because of the importance of the relationship between the two companies, UHC initially rolled out this program in only two states. Even then, UHC continued to offer Tivity's SilverSneakers program to at least its Group Medicare Advantage members. Furthermore, the Amended Complaint does not allege that UHC's Optum Fitness Advantage program caused or threatened to cause Tivity to lose a significant number of members, or even that it had any impact on Tivity's revenues. From this, the only compelling inference to be drawn (according to Defendants) is that Tivity believed that UHC's actions were having little or no effect on Tivity's business or operations and that, therefore, Tivity had no duty to disclose it.
On the other hand, Weiner argues the compelling inference of knowledge or recklessness can be derived from the fact that Tivity had long warned about health plans taking competitive programs in-house and, *916 recognizing that UHC was a top customer, panicked once UHC actually began to compete. Not only were their suspicious stock sales by Defendants Hargreaves, and by Tivity's Chief Legal Office and a director member of the compensation in large amounts during the class period that significantly reduced their respective shares in the company, Tivity formed a special committee, and implemented a communications plan, to combat the UHC threat.[11]
In the Court's view, the competing, plausible inferences are equally compelling. "[W]here two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward." Frank I, 547 F.3d at 571. That is, in such circumstances, " ' Tellabs now awards the draw to the plaintiff.' " Id. (quoting ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008) ).
IV. Conclusion
On the basis of the foregoing, Defendants' Motion to Dismiss (Doc. No. 38) will be denied, and this case will be returned to Magistrate Judge Newbern for further pretrial case management.[12]
An appropriate Order will enter.

The PSLRA was intended to supersede and supplement the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure for claims sounding in fraud. In re Navarre Corp. Sec. Litig., 299 F.3d 735, 742 (8th Cir. 2002). While "both provisions require facts to be pleaded 'with particularity' " the PSLRA's requirement for pleading scienter, "marks a sharp break with Rule 9(b)," because " 'a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b).' " Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009) (quoting Mizzaro v. Home Depot, Inc., 544 F.3d 1230, 1238 (11th Cir. 2008) ); see also Wyser-Pratte Mgmt. Co. v. Telxon Corp., 413 F.3d 553, 563 (6th Cir. 2005) (observing that "Rule 9 provides that a defendant's state of mind 'may be averred generally,' while the PSLRA adopted a heightened standard for pleading scienter in federal securities fraud cases").

Even with the heightened pleading standards applicable to a securities case under § 10(b), the allegations in the complaint are accepted as true, Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008) (Frank I ), and all reasonable inferences are drawn in plaintiff's favor, Lormand v. US Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).

Bondali does not discuss the applicable standard.

The Prime program was similar to SilverSneakers, but was directed at the 18 to 64-year old population and was offered through commercial health plans and employers. (Doc. No. 32, Amended Complaint ¶ 25, n. 4).

Under the PSLRA, a "forward-looking statement" is defined as: "(A) a statement containing a projection of revenues ... or other financial items; (B) a statement of the plans and objectives of management for future operations ... ; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management; [and] (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)[.]" 15 U.S.C. § 78u-5(i)(1).

Unlike Weiner, the Court does not find it "debatable" whether the statements at issue were (at least in part) forward-looking. The April 2017 press-release spoke about strengthening market leadership going forward, the July 2017 press release suggested a long-term opportunity, and Tramuto talked about the expected benefit from improving performance in the October 2017 conference call.

At a minimum, these allegations encompass the first, second, third, and sixth Helwig factors.

Because Defendants seek dismissal of the Section 20(a) claims for secondary liability against the individual Defendants solely on the grounds that the Amended Complaint fails to adequately allege a Section 10(b) violation, the Section 20(a) claims likewise will not be dismissed.